Good morning. Good morning. James Mayo on behalf of the appellant Marilyn Dang. As the Court will recall, the action below was an action for denaturalization in which the Court granted the government's summary judgment motion, which was granted after the government filed a belated amendment to their complaint, which was actually filed after the pretrial conference was held. And the Court denied appellant's motion or opposition to the motion seeking leave to amend. Because this is a denaturalization action, fundamental rights and precious rights are at stake here, appellant's citizenship. The district court was solicitous in recognizing these rights and acted appropriately in seeking appointment of counsel on a pro bono basis, which continues today. Unfortunately, despite that vigilance and the best intentions, it's respectfully submitted the district court erred in several material respects in granting the summary judgment motion. The Supreme Court has made clear that to protect the precious rights and privileges of United States citizenship and to guard against the government's overzealousness in seeking to strip a naturalized citizen of his or her citizenship, that the government must meet exacting and stringent due process requirements, which, of course, must also be recognized by the district court. First, as a part of the ---- Kennedy. If the district court had before it evidence that your client committed the crime of arson during the statutory period, could this court affirm on that basis alone? I don't believe so. Why? Because the statutory ---- the regulation upon which the court would have to base its ruling is ultra-virus and unconstitutional. As we set forth in our briefing, the regulation which allows the government to bring in, or at least from the government's perspective, allows the government to show any unlawful act, even if that unlawful act amounted to ---- does not ---- well, let me just start again. The unlawful act regulation upon which the court would have to rely does not establish any uniform rule of naturalization or, in this case, denaturalization because it allows the government to act according to its own predilections in ---- which is untethered to any Federal policy or Federal criminal statute. This Court has previously made clear in the Nim case and the Kahn case, which were cited in our brief, that in order for a rule of naturalization to have any constitutionality, it must be tethered to a uniform Federal policy. And here that's not the case. Secondly, the statute upon which the court would have to base its decision, Section 1, provides for the convictions that occur during the good moral character period, not the mere commission of a criminal act. Alternatively, the person seeking naturalization would have to admit to that commission and that didn't occur here. Kennedy. Doesn't the statute have like a catch-all phrase? It does. And that's the basis, the springboard upon which the government is seeking to assert the regulation. And again, as I said before ---- Kennedy. According to your argument, the catch-all phrase is meaningless. It doesn't add anything to the statute. I don't think it's meaningless, Your Honor, because I think it's the statute is very specific in describing certain classes of persons who are entitled, or rather who cannot demonstrate good moral character. One of those classes specifically includes persons who are convicted of or admit to the commission of an aggravated felony or a crime involving moral turpitude. If it was the statute were interpreted to include the full panoply of unlawful acts untethered to any Federal definition, the exception would essentially swallow the rule that's specifically set forth in the statute. You know, the specific should govern the general. I want to return to your argument, which I think is a difficult one. I think the first one you made, that the district court erred in granting the motion to amend. I believe it did, Your Honor. Respectfully. Let me ask my question now. I frankly, I don't know of any case where a district court has been reversed for granting a motion to amend. Do you know of any such case? I haven't found the case, which obviously makes our case a little bit different. But I think the record is clear here that, respectfully, the Court misapprehended the scope of its discretion because it didn't fully comprehend, in my view, and it's Well, even assuming, even assuming there might otherwise, that could be an abuse of discretion, don't you have to show some kind of prejudice from that abuse of discretion? Ordinarily, you would have to show prejudice under Rule 15 of the Federal Rules of Civil Procedure. But here we're dealing with a distinct rule that has a more onerous and stringent standard. So you can assert error and rely on error even though you weren't prejudiced? I think we were prejudiced. Well, what was the prejudice? The prejudice was we were forced to respond to a belated theory on the very eve of trial that had not been tested in any prior, in any of the prior. Did you complain that you needed more time to prepare for trial or something like that? I don't think so. Well, what does belatedness have to do with any prejudice? You knew all about the testimony. You're the one that raised the issue. This Court's prior precedent clearly dictates, and that's the Johnson v. Mammoth case, that prejudice is not part of the calculus. If the Court finds that the government in this case was tardy, that alone ends the analysis. And the Court did make that finding specifically. However, in our view, it misapprehended the scope of its discretion to deny the amendment under Rule 16 and to prevent the government from asserting that, the very same theory in a subsequent case. I think the Court certainly has, within its Rule 16 powers, the power to circumscribe the government. So that's my position on that, Your Honor. All right. Well, assuming prejudice is required, how were you prejudiced? Well, we were, again, we were prejudiced insofar as this case from day one was one of, you know, a series of delay, piled on delay. The government waited for over five years to seek denaturalization after it was imputed with knowledge that my client was convicted of the crime, of the crimes in issue. And the government waited another two or three years to bring us a memo when it admitted that he knew the theory. That goes to your latches argument, right? But the question is, how are you prejudiced by the amendment? Well, we continue to remain prejudiced, frankly, because we have to meet that new legal theory. It delayed the proceedings. But what new evidence did you, would you have presented in response to the new legal theory that was different from the evidence you would have presented on the other two? If we assume the propriety of the government's theory, which, again, we disagree with in terms of its constitutionality and from a lack of uniformity standpoint, as well as the fact that it's ultra-virus and violates due process, but if you put that aside for the moment, the regulation permits the defendant or the person against whom denaturalization is sought to present extenuating circumstances. In order to prepare for and to meet our opportunity to demonstrate extenuating circumstances, obviously, I would have to go back and seek preparation for that. My client was in prison at the time, and I was unable to communicate with her. I mean, these are things that clearly would have delayed the trial and affected her ability to defend herself. But there was no request for additional time. Well, there was no request insofar as the Court permitted the government on its request the opportunity to file a summary judgment motion and also put the trial date over. You're asking us to reverse what the district court did in regard to allowing the amendment, and my memory is consistent with Judge Tshima's. I can't remember a case, especially in a case governed by the rules of civil procedure, which says leave to amend shall be liberally granted, freely granted.  But, again, the distinction, Your Honor, is that that's a. If I can finish. Let me finish. Okay. Where the Court says I'm going to allow an amendment and your principal prejudice is the lack of time to prepare, yet you don't tell the district court that you need more time to prepare. Is there any suggestion on the record that the district court would not have given you more time? I don't believe there is, Your Honor. However, again, just to reiterate, we're talking about a Rule 16 standard here, which is a different animal than Rule 15. Under Rule 15, amendments shall be liberally granted. Under Rule 16, there is a good faith requirement, there is a timeliness requirement which wasn't met here, and Rule 16 does not require the aggrieved party to demonstrate prejudice. This Court has previously so found in the Johnson case. And with that, I would submit that issue on that basis. The second error respectfully committed by the district court below was that the Court permitted the government to proceed on its new theory, despite the fact that the government hadn't filed the required affidavit of good cause here. Under established Supreme Court precedent, as well as Section 1451 of the INA, the court's subject matter jurisdiction to file and proffer an affidavit of good cause not only to initiate the action, but to maintain it. Here, the government was one filed, wasn't there? There was one filed with the initial complaint in 2001, but when the amendment was brought several years later, there was no affidavit of good cause supplied in connection with that amended complaint, even though, and this is the critical point, the amendment added a new cause of action. There was no affidavit of good cause that was specifically tethered to the new cause of action, a cause of action which the government conceded had really not been untested. It was a new legal theory. And at the very least, in order to bring the drastic remedy of denaturalization, the citizen is entitled to some type of overview by the government. Their procedures, in terms of the affidavit of good cause, require a hierarchical review of the case and the theories, the facts and the legal theories, to make sure that the court can be assured that there's good cause to initiate as well as maintain the action. That did not occur here. It's submitted that the court lacked subject matter jurisdiction to proceed on that basis, and the summary judgment motion should be reversed. The last issue, and I've already touched on it, is the due process issue. Again, the government was – it's well established the government is required to prove by clear, convincing and unequivocal evidence that it's – that the drastic remedy of denaturalization is warranted. In our view, and I touched on it before, the statute and the regulation upon which the court based its summary judgment ruling is unconstitutional because it just out of its face lacks uniformity. That's detailed in my brief, and I don't want to go over that today unless the Court has any specific questions. And the other component of due process which was not afforded here in terms of a fair hearing was that my client was never afforded the opportunity to demonstrate any extenuating circumstances. In fact, as is apparent from the record, she – I requested at the hearing on the summary judgment motion, and I specifically pointed to evidence that the government itself had submitted in support of its motion that demonstrated that my client was despondent at the time of the – at the time the alleged crimes were committed, and we would have been able to demonstrate serious and substantial extenuating circumstances, and the Court just never allowed us the opportunity to do so. In fact, if you look closely at the Court's opinion, it merely states in conclusory fashion, respectfully, that we haven't demonstrated any extenuating circumstances when that is, in fact, apparent from the face of the record itself. Lastly, I'm – I'm trying to make clear in my mind that your argument about extenuating circumstances, is it, A, we wanted to put on that evidence and the district court wouldn't let me, or, B, there was evidence in the record showing extenuating circumstance and the judge did not refer to it in his order? I think it's a combination of both, Your Honor. I think we – we did request – To the extent it involves A, can you point to the record where you asked to present extenuating circumstances and were denied the opportunity? I believe I can, Your Honor. It's found at ER, the excerpts of record at page 125, which is the government's Exhibit 10, and specifically at the hearing, the hearing transcript is at ER page 729 through 731. That's when I – that's when I specifically requested the opportunity to present extenuating circumstances to the Court below. And the Court, in its final order, simply stated that Epelin has presented no extenuating circumstances. Again, if we were provided the opportunity to do so, I think we would be able to make a significant and substantial showing. At the very least, we're entitled to an evidentiary hearing on that issue. Just describe for me, if you don't mind, what evidence that you were thinking about putting on, because it's not readily apparent to me. Well, the citation to the record I referred to is a police report in which the appellant was interviewed by police and communicated contemporaneously at that time to the police that she was despondent over the fact that she was having difficulties with her family. Her children weren't attending school. She is financially, you know, destitute. She's a mother of five children who need – who was having significant intrafamily problems as well as financial difficulties. And as the Court will note, the underlying crimes all related to acts which were allegedly perpetrated for financial gain. I think we would be able to show that she was just desperate financially and emotionally and psychologically. And also from a cultural standpoint, my client is Vietnamese, and there are different cultural factors at play here in terms of, you know, what might be culturally appropriate under the circumstances to provide for your family. Those would be sort of a thumbnail sketch of what we might be saying. What do you mean by that? What do you mean by that? Which? The cultural differences. Well, I'm certainly not an expert on Vietnamese culture, but it's my understanding that there are certain behaviors in Vietnamese culture that might be more acceptable from a cultural standpoint that we might view here as unacceptable criminal activity. Are you talking about insurance fraud? Yes. And I don't mean to say this in a disparaging way, because obviously I don't fully comprehend, you know, the nuances of Vietnamese culture. But from my understanding, that is indeed the case. And in terms of establishing her criminal intent, that would certainly be a factor that would weigh on that. Moreover, there are certain issues. I was involved in the underlying, her underlying criminal case. But having reviewed the record, there are certain issues, legal issues there as well, relating to Coors' confessions and violations of Miranda, which were never raised in the underlying case, that I would, of course, seek to raise in the context of an evidentiary hearing. My earlier question to you was to point to the record where you asked the court to ask Judge Shubb. That is who tried the case, isn't it? Yes, it is. Where you asked Judge Shubb for the opportunity to present mitigating, explanatory, extenuating circumstance evidence, and you refused the opportunity, and you point us to a police report? That was the police report is Government's Exhibit 10. That's ER 125. That's the, I was directing the court to that report as evidence where she had indicated her despondency. I must not be being clear at this point. With respect to the request that I made to Judge Shubb, that's, that was at ER 729. Is that volume 3? It is. It's tab number 37. Okay. Can you point me to page and line? Page 18, well, page 17, line 5 is where I refer to the exhibit and her despondency as at least partial evidence of the extenuating circumstance. And then it goes on to page 18 and around line 8 forward is where I discuss the need for hearing on extenuating circumstances. I've just done a quick read of it. It sounds to me like you were arguing to Judge Shubb that the police report having come in and having contained some evidence of extenuating circumstances, that shifted the burden to the United States Government to prove that there were no extenuating circumstances? Well, I haven't touched upon that issue here today, although it's in my brief. It's in my briefing. And my position on that would be as articulated in the brief, that because the Government I've taken you a little over my time, your time. But I invite you either in rebuttal, we'll give you a little time for rebuttal, or in a post-argument brief to show us page and line where you offered to present extenuating circumstance evidence and you were refused. Not that you argued the Government should be putting on evidence that there wasn't any, but where you said, I want to call this witness, put on these exhibits, and Judge Shubb said no. Understand the question? I do. And I will say to the Court with all candor that I don't know that that actually exists in the record, because the record is a little bit muddled on that point. But I would point the Court specifically to those sections that I identified. Okay. And I would submit it on that basis. Okay. You're a little over your time, but if you want some rebuttal, we'll give you a little bit of time. We'll hear from the Government at this time. Thank you. Thank you. Good morning, Your Honors. Patrizia Corrales appearing for the United States in this case. As the Court has noted, I believe in this case the district court judge, Judge Shubb specifically, properly granted the government's motion to amend to allow us to add count three, which is at issue in this matter, and properly granted the government's motion for partial summary judgment. Yes, Your Honor. Ms. Corrales, before the point gets lost, could you give us your take on this business about extenuating circumstances and, you know, and whether or not the defendant had the opportunity or sought the opportunity to present further extenuating circumstance evidence? Thank you, Your Honor. I would like to touch on that point. The unlawful acts reg specifically says that unless an applicant for naturalization presents extenuating circumstances, the applicant will fail until they have lacked good moral character if they've committed unlawful acts that adversely reflect against their moral character. In this case, Mr. Mayo never raised the issue of extenuating circumstances until the summary judgment hearing. And even in that hearing, he never requested Judge Shubb for continuance of the trial or for additional discovery period to open up the discovery phase, if you will, to allow him to explore that potential defense, if you will. Don't you think that would have been a fair approach? I mean, the government comes in with a very, very late motion to amend, and it's a critical amendment. And essentially, even though I don't think they'd be requested on the record, you didn't have a trial on that. You didn't have discovery on that. I mean, normally you'd say, all right, if you've got a whole different theory here on which there's a different defense, it really ought to perhaps continue the trial, allow limited discovery, and then hear the summary judgment motion or try it on the new theory, right? Well, Your Honor, let me just, if I can, let me address a couple of points that you brought up. First, yes, it was a late motion, but why was it a late motion? Because Ms. Deng in this case never, during the discovery phase, during the pretrial phase, ever disclosed this so-called precipitant witness who was a witness to both her naturalization interview and to the time when she had to submit a particular form before she took the oath of allegiance to become a United States citizen. It was on that basis, Your Honor. But you knew from the beginning, the government knew from the beginning, that she was going to defend that charge by saying, I didn't sign it. No. We did not know that. We did not know. She said she didn't sign it, right? No, Your Honor. Go ahead. A little different, if I may. If the record is pretty clear on this point, what Ms. Deng said both at her deposition and in her declaration was that someone in the INS had checked that off for her, in relationship to N-4458. All right. Sure. All right. She never once at all said, my daughter was there. My daughter is the one that filled it out. I agree. Her defense was she didn't sign it. Right. That's a little different, but that was the reason and the basis for which the government moved to amend the complaint. But why wasn't that theory, why wasn't that theory, not to interrupt, why wasn't that your theory available from the beginning? Well, Your Honor, when we brought the complaint in this case, we alleged two bases for the procurement of Ms. Deng's citizenship, both on an illegal basis and on a basis that she obtained it by fraud and misrepresentation. The government's not obligated to plead all its theories in the beginning. At that point, we believe that we have sufficient evidence to go forward on those theories. I think you're answering a different question than I asked. Why wasn't that theory available at the beginning? It was, wasn't it? We could have brought it. Yes, Your Honor. Okay. That's all I asked. Yes. I didn't ask why you didn't, but I will now. I mean, it's a good theory. You had it available from the beginning. There's nothing about the surprise that would cause you to say, well, here's what we need to do in response to the surprise. It's just a better theory that you had. Well. Because it didn't look like your first two counts were going to pan out at trial. Your Honor, I'm going to disagree with that. Go ahead. I'm not arguing with you. I'm asking a question. You're right. Oh, no, and I'm not trying to argue with the Court. Relax. I take a different take on that, Your Honor. We bring the unlawful acts. Could we have brought it at the initial time that we filed the complaint? We could have brought it. Sure. But because we didn't bring it doesn't mean that the district court's decision in this case allowing us to amend the complaint was wrong or was an abuse of discretion. I'm not even getting that far. Let me, if I can, go back to your initial question, a few questions back. You asked about the extenuating circumstances. In this case, Mr. Mayo, Ms. Fang's attorney, did not at any point after the Court granted our motion to amend ask for additional time for discovery or ask for a postponement of the trial in this case. To present or to present additional evidence relating to the extenuating circumstances. I think what's very salient in this case is the affidavit of good cause, which alleged the underlying facts for why the government brought this case, the first instance, that is, that the fact that she committed arson, the fact that she had strapped her, you know, 4-month-old child in his car seat and then torched her car to try to collect insurance fraud, that had been part of the record for 2 years. Ms. Fang was on notice of that, of those facts for the last 2 years. She could have at any point certainly tried as a mitigating factor, established some extenuating circumstances, particularly so much more after we, the Court, excuse me, the Court granted our motion to amend. But again, Ms. Fang in this case never chose to request additional time to present that type of evidence. He, but, I'm so sorry, Your Honor, go ahead. When did the government first learn that the daughter might be a witness? We learned for the very first time, Your Honor, right before the final pretrial conference. As you know, before a trial date, you have a final pretrial conference status. This would have been in October of 2003? October of 2003. We, the parties, are obligated to prepare a final pretrial conference report, if you will, setting forth what our issues are going to be, you know, any concessions or stipulations. And how soon thereafter did you depose Rachel? Your Honor, soon after we learned, we filed a, at the final pretrial conference, I raised the issue of having her excluded. I'm just looking for a date. We deposed her, I think, either a week later, within a short period of time. And was it within that deposition that you, the government, learned for the first time that there would be a witness to say that someone other than Mrs. Dang filled out the form at the naturalization ceremony? That was the very first instance that the government was put on notice that Mrs. Dang's daughter, Rachel, went in this case. And when did you move to amend? We then filed a motion. Excuse me. I've got the specific dates, if I can. We deposed. Five days later, wasn't it? Yes, on the 28th. Actually, on the 22nd, after deposing Mrs. Dang's witness, we sent a letter to the court requesting one striker as a witness or alternatively allowing us to amend the complaint. The court then had a status conference on October 28th of 2003 and allowed us to submit our motion to amend and setting forth the basis for our motion to amend on October 30th. And that's when we filed the motion to amend. Okay. And it was allowed in December? Your Honor, I believe after a hearing on our motion to amend, which was on November 24th, 2003, the court did find validity in the government's motion and in the basis. And allowed the amendment. And allowed the amendment, yes. The court found good cause. And you moved for summary judgment on count 3 nine months later? We moved for summary judgment on September 13th, 2004, yes, Your Honor. We had to also deal with the motion to dismiss the First Amendment complaint that Mr. Dang filed. I'm not asking why. Oh. I'm just pointing out that asking is it correct that about nine months went by from the time that the count 3 was allowed and the time the government moved for summary judgment? I believe that's a correct assessment of the time frame, yes, Your Honor. All right. Can you address for a minute this argument that the regulation in question, 316.10b3 something or other, doesn't comply with the uniformity requirement of the Constitution because it, in effect, you know, permits denaturalization or denial of naturalization, you know, based upon the vagaries of State law? Yes, Your Honor, if I can. The Constitution requires a uniform application of naturalization. The rule of good moral character is a uniform all across the nation, regardless of where you're at, whatever geographical state you may be located, requires that an applicant has the burden to establish that they are a person of good moral character in order to be bestowed with this great treasured right that we give aliens, and that is the right of U.S. citizenship. Now, how the rule is applied or adjudicated may differ from applicant to applicant because each case is looked on a case-by-case basis. And Does that mean that a crime in one case might not be considered as a, but let me put it this way, that the same crime in one case can constitutionally be considered differently in another case? Well, I, no, because I think a crime is a crime in all 50 States, Your Honor. But I think what is important here is that we measure character by measuring conduct. And an inquiry officer, an officer who is there determining whether this applicant has good moral character, has the statute in mind, i.e., the statute that the individual is required to establish good moral character. Right. Now, it's undisputed, Your Honor, that Ms. Dang's crimes in this case, the crime of arson and willful cruelty to a child, insurance fraud, false reporting a criminal act, or a crime, if you will, is a crime in all 50 States. It's been criminalized. So there's no dispute as to that. And Ms. Dang cannot constitute, cannot attack the validity or the constitutionality of the application of that statute since it applies to her within the constitutional guidelines. I don't believe the unlawful acts regulation in this case is not, is constrained by the requirement that it's an unlawful act that adversely reflects upon a person's good moral character. It's clear that arson and willful cruelty to a child and insurance fraud adversely reflected Ms. Dang's moral character. And had she been truthful, had she been honest about what she did, the government would have never permitted her to obtain U.S. citizenship. On that basis, we'll submit, unless the Court has any other questions. Roberts, I don't see any others. Thank you very much for your argument. Counsel will give you a minute for rebuttal. Thank you, Your Honors. I just wanted to touch on one, excuse me, one point that was raised during the Court's discussion with the government's counsel, and that is the notion that the government's counsel. Will you speak up, please? I'm sorry. I'm a little tall for the microphone here. The Court specifically queried whether or not the pretrial disclosures were the first time the government learned of my client's daughter's relationship to the naturalization proceeding in issue here. However, I think if you – I wanted to respond to that. If you look at the record, it's – it amply demonstrates that the government was clearly on notice of her existence. She obtained her citizenship derivatively through my client. The government knew, or at least should be imputed with the knowledge, that she was present during the oath ceremony attended by my client. And the government itself, as the record reflects, possessed investigation reports which indicated that my client's daughter existed. While the specific nexus – But they didn't – the government didn't – I think it's fair to say the government didn't know that she was going to testify. That's correct. And I think the Court –  And I think the Court's assessment is that you submitted a witness list on October 1, 2002, and Rachel was not on it, correct? I believe that's correct, yes. However, after – and the government – this is, I think, patent from the record as well. I did not learn of her specific relationship as a witness, her specific testimony as a witness, until after that initial disclosure. There was obviously no intent to just see the testimony. Oh, no, I didn't mean that, but you said they knew about her. That's great. They knew she had a daughter. They didn't know she was going to be a witness because she was not on the witness list. And I assume you timely notified the government in October of 2003 that Rachel would be a witness. That's correct. That's when they deposed her, correct? Yes. And at that deposition, they learned that she would say, I was the one that – Right. Checked the box at the naturalization ceremony. And I think, just to close on this point, Your Honor, the sequence is important here. The government clearly sought, at all costs, to de-naturalize my client, irrespective of her due process rights. The amendment to the complaint, as the record reveals, succeeded the government's – the Court's denial of the government's first motion for partial summary judgment, in which the Court found their material disputes as their first – factual disputes as their first two theories. The government came in a day late and a dollar short on this. And unfortunately, and respectfully, the Court didn't, in our view, appreciate the full scope of his discretion to deny that amendment. And with that, I would submit it. Okay. Thank you for your argument, counsel. The case just argued will be submitted for decision. And we will proceed to the next case on the argument calendar.
judges: Noonan, Hawkins, Thomas